Keeler, J.
The propositions involved arise on a motion by defendant to direct a verdict.
The facts are these: on September 24th, 1908, one Jerry Ma-honey, while passing along a public highway, was knocked down and killed by an automobile in the possession, as alleged, of the defendant, but which was then and there carelessly and negligently operated by defendant’s servant.
The driver had been told by Mr. Booth, of the defendant company, to take the automobile direct to the Detroit boat for shipment, “and as soon as he could, so as to have it properly tagged and freighted.” The boat was scheduled to leave at 10:45 p. m. The distance was about one mile, and could easily have been made in fifteen or twenty minutes. The point of destination *146 was due west, and the usual way was via the alley at the rear of the garage west to Eighteenth street, north to Euclid avenue, west to Ninth street, north to Superior avenue, west to the dock, with which route the driver was well acquainted. He left with the automobile just after the close of business, having over four hours in which to do the errand. He drove west through the alley to Eighteenth street, south to Prospect avenue, east to a restaurant, where he had his supper, and where he invited two waitresses to accompany him on a joy-ride. They proceeded east on Prospect avenue to get another girl,, but not finding her, he turned his machine and went west on the same street to Eighteenth street, thence north to Euclid avenue, west on Euclid avenue, passing the garage from which he started, to Seventeenth street, north to Walnut avenue, where they stopped at a saloon and had a drink or drinks. From there the course was west to Ninth street, thence north, crossing Superior avenue, to St. Clair avenue. He was going east on St. Clair avenue at the time of the collision, his destination being Euclid Beach Park, some twelve miles east of the boat landing.
It will be observed that the driver or chauffeur changed his course not less than nine times, covering a distance of probably three miles. The extent of the deviation or extra via was great, marked and unusual.
What was the legal status of the parties growing out of the foregoing facts?
In support of the motion, it is claimed that at the time of the injury the driver was not acting within the scope of Ms employment, and hence the defendant can not be held liable.
It is a well-settled principle of law that for all acts done by a servant in obedience to the express requirements of the master’s business, within the scope of his employment, and for acts in any sense warranted by the express or implied authority conferred upon him, considering the nature of the service required, the instructions given, and the circumstances under which the act is done, the master is responsible; for acts which are not within these conditions, the servant alone is responsible.
It hardly seems necessary to cite authorities on this proposition; the books are full of them. Its fairness, its equity and its *147 soundness must, on a moment’s-reflection, be conceded. But its application to automobiles, tbeir owners and drivers has become so general and frequent that I deem it advisable to quote from a few of the leading authorities.
In Railway v. Wetmore, 19 O. S., 110, the Supreme Court of Ohio says:
“The master is not responsible for the wrongful act of his servant, unless that act be done in execution of the authority, express or implied, given by the master. Beyond the scope of his employment, the servant is as much a stranger to his master as any third .person, and the act of the servant not done in the execution of the service for which he was engaged can not be regarded as the act of the master.”
In Lotz v. Hanlon, 217 Pa. St., 339, the court say:
“In an action against the owner of an automobile for injuries caused by the running of the machine, it is essential to a recovery that it shall be made to appear that the accident occurred while the person in charge of the automobile was using it in the course of his employment and in his master’s business.”
In Cunningham v. Castle, 111 N. Y. Supp., 1057, the New York Supreme Court holds that:
“Where a chauffeur takes his master’s automobile, and while using it for his own purposes and not in the scope of his employment, negligently runs into and injures a third person, the master is not liable for the injury, even though the master consented that the servant should use his automobile in the manner in which it did.,
“Beyond the scope of his employment, the servant is as much a stranger to his master as any third person, and the act of the servant not done in the execution of the service for which he was engaged can not be regarded as the act of the master.
“If the act was done while the servant was at liberty from his service and pursuing his own ends exclusively, the master is not responsible, even though the injuries complained of could not have, been committed without the facilities afforded by the servant’s relations to his master.” (Affirmed in 127 N. Y. App. Div., 580.)
In Heliby v. Smith, 116 Mass., 265, the court holds:
“The owner of a motor car is not liable for an injury caused by the negligent driving of a person who is using the car for *148 his own benefit, and not in the business of the owner, nor in pursuance of the owner’s instructions.”
In Morier v. St. Paul Railway Company, 31 Minn., 351, the court say (using the same language found in 19 O. S., 110):
“Beyond the scope of his employment, the servant is as much a stranger to his master as any third person. The master is only responsible so long as the servant can be said to be doing the act in the doing of which he is guilty of negligence in the course of his employment. If the servant step aside from his master’s business, for however short a time, to do an act not connected with such business, the relation of master and servant is for the time suspended. Such, variously expressed, is the uniform doctrine laid down by the authorities. ’ ’
The case of Steffen v. McNaughton, 124 N. W., 1016, lays down the following doctrine:
“Under the contract of employment, the chauffeur was to care for and to operate the car during the day. The chauffeur boarded himself, and for his mid-day meal was allowed to go to his home about a mile distant. In making these trips he used the automobile, but without the owner’s permission or knowledge, and on one of such trips the accident occurred, for which it was sought to hold the owner liable. The question was, whether the servant was acting within the scope of his employment at the time of the accident. It was contended on behalf of the plaintiff that the use of the automobile under the circumstances of the case raised the inference that the chauffeur had a permissive right to use it to facilitate his labor and service, that he thereby reduced the time for getting his meals, was thus able to devote more time to the service of his employer, and was acting within the privilege of his employment and in furtherance of his master’s interests. The court rejected this contention, however, and held that the chauffeur was acting outside the scope of his employment, and that the master was not liable.”
In Patterson v. Kates, 152 Fed., 481, the following doctrine was enunciated by the court:
“Defendant owned an automobile, which broke down while he was making a trip from Atlantic City to Philadelphia. He then left the auto in charge of the chauffeur, with instructions to repair and bring the machine on to Philadelphia. While waiting for a ferry at the Delaware river on his way to Philadelphia, the chauffeur consented to take a third person in the automobile *149 to a place about a mile back ou tbe road, and while making such trip, through his negligence in driving too fast, he collided with a horse and buggy, which caused injury to the plaintiff.
“It was held that, under these facts, the defendant was not liable for the injury.”
Shearman and Redfield on Negligence, Section 147:
"In determining whether a particular act is done in the course of the servant’s employment, it is proper, first, to inquire whether the servant was at the time engaged in serving his master. If the act is done while the servant is at liberty from service and pursuing his own ends exclusively, there can be no question of the master’s freedom from all responsibility, even though the injury complained of could not have been committed without the facilities afforded to the servant by his relation to his master."
To the same effect are the decisions of the courts in the following cases: Stewart v. Baruch, 103 N. Y. App. Div., 577; Clark v. Buckmobile Co., 94 N. Y. Sup., 771; Maher v. Benedict, 123 N. Y. App. Div., 57; Higgins v. Western Union, 156 N. Y., 75; Perlstein v. American Exp. Co., 177 Mass., 530; McCarthy v. Timmins, 178 Mass., 378; Doran v. Thomsen, 66 Atl. Rep., 987 (74 N. J. L., 445); Danforth v. Fisher, 75 N. H., 111 (21 L. R. A. [N. S.], 93); Reynolds v. Buck, 103 N. W., 946 (Iowa); Slater v. Advance Thresher Co., 97 Minn., 305; Sullivan v. Morrice, 109 Ill. App., 650; Barmore v. Vicksburg Co., 85 Miss., 426; Evans v. Dyke Auto Co., 121 Mo. App., 266; Garretson v. Deunckel, 50 Mo., 104; Jones v. Hoge, 92 Pac., 433.
The general proposition of law as to the relation of master and servant is not disputed here; but it is claimed by counsel for the plaintiff that it has no application to the case at bar, for the reason that the driver was at the time in the actual employ of the defendant, that is, that his time was under the control of and being paid for by the defendant. The error of this proposition is in its failure to keep in mind the distinction between an act done by the servant within the scope of his employment and an act done during his employment. Says Wood, in his work on the Law of Master and Servant, Section 286:
“If the act of the servant is not expressly ordered by the master, the master is not liable therefor, even though done in *150 the usual course of his employment. The question is, whether the act was expressly or impliedly authorized, in view of the employment, its character, the nature of the service required, the instructions given, and the circumstances under which the act was done. The simple test is, not whether the act was done while prosecuting the master’s business, but whether it was done by the servant in furtherance thereof, and, further, such as may fairly be said to have been authorized by the master.”
Upon this subject, says the 136 Fed. Rep., page 306:
“There is a marked distinction between an act done by the servant during his employment and an act done within the scope of his employment. To bind a master for an injury done by the servant, the servant must at the time be acting for the master within the scope of the duty assigned to him."
In view of the conceded facts in this case, I therefore dismiss this claim of the plaintiff.
It is claimed, further, that the automobile which the driver was then using, and with which he had been entrusted by the defendant, was a dangerous agency, thus bringing the case within the spirit and purpose of 47 O. S., 387, which holds as follows:
“The law requires of those who use dangerous agencies in the prosecution of their business to observe the greatest care in the custody and use of them. This duty can not be lifted by a master from" himself to his servants, so as to exonerate him from the negligence of the servant in the use and custody of them. Where they are so entrusted, the proper custody, as well as the use of them, becomes a part of the servant’s employment by the master, and his negligence in either regard is imputable to the master, in an action by one injured thereby. And where the injury results from the negligence of the servant in the custody of the instrument, it is immaterial, so far as the liability of the master is concerned, as to what use may have been made of it by the servant."
This is strong language, but its application here depends upon whether or not the automobile is to be construed as belonging to that class of agencies known as dynamite, nitro-glycerin and other dangerous instrumentalities. The attempt has been made in a number of instances to have it so classified by courts, but invariably, as I read the reports, it has failed. I have discovered a considerable diversity of opinion as to what is and what is *151 not a dangerous instrumentality. Rules which were laid down in the earlier decisions have been modified to keep pace with the progress of science and invention; and the tendency of modern judicial opinion is to distinguish between those agencies which are inherently dangerous and those which become dangerous only when improperly used. If an automobile is such dangerous agency, then the defendant in this action would be liable for the negligent act of the driver, although at the time of the injury he was not in the prosecution of defendant’s business. Explosives generally are classified as dangerous instrumentalities; but the question is not whether the automobile may become a dangerous agency in the hands of a negligent chauffeur or driver, but, rather, whether it is itself inherently dangerous. It has taken the place, to a very large extent, of the use of the horse as a mode of conveyance. It is used as a means of transportation, is recognized as lawful, and sanctioned by most of the states of the Union. While it may be, and frequently is, used in an unlawful, unsafe and dangerous manner, it nevertheless remains as a lawful means of conveyance, recognized as such by the courts and legislatures of the country. The driver of it is required to exercise care and skill commensurate with its use; and while the' driver of a horse and carriage is not required to exercise as much skill and caution as the driver of an automobile, yet, nevertheless, he is required to use such skill and care as are commensurate with the safe operation of the conveyance operated by him. . And while it is true that the courts require the automobile driver to use great diligence, yet they have not gone to the extent of holding that the automobile is in itself a dangerous agency. It is true that its operation is attended with some danger not common to ordinary vehicles, but it is not on that account to be judicially classed as a dangerous instrument within the well-understood meaning of that term.
On this subject it may be noted that twelve times as many people were killed by wagons as by automobiles in Chicago in 1905. These figures sound rather strange today, and I am inclined to believe that far more people have been killed in this country during the last year by the reckless driving of automobiles than by the careless use of dynamite or nitro-glycerin, *152 or possibly both combined. Statistics for the city of Cleveland for the first eleven months of the year 1911 show thirty-four deaths by automobiles, being about one to each 16,000 of population, and approximately three hundred injuries; and statistics for nine of the large cities in Cleveland’s class show a mortality of two hundred and thirty-three. How many others were seriously injured throughout the country within that period is not now ascertainable, but three to four thousand would not be an extravagant guess. Of course it would be unfair to say, in the absence of knowledge, that all these deaths and injuries were caused by the negligence of the driver. They are impressive facts, however, and are suggestive of that rather drastic construction by some courts of which I will speak later. But it is the inherent danger of the agency that makes it dangerous. In and of itself, an automobile is an inoffensive, harmless machine. It becomes dangerous only when a dangerous driver is at the wheel.
The holdings of the courts before which this question has arisen, at this point become interesting and instructive.
In Jones v. Hoge, 47 Wash., 663, the court say:
“It is contended by respondent that an automobile is a machine of such danger as to render the owner thereof liable for injuries caused thereby while operated by his chauffeur, and even though not engaged directly in his line of employment, if the master has made it possible for the chauffeur to take out and operate such machine at pleasure; that the master is holden to employ only such chauffeurs as are competent and careful; and must be holden for damages occasioned by their ineompetency and recklessness when making use of the machine, even though out of the line of employment, and also that in this case Barnes (chauffeur) was within the apparent scope of his authority.
“We do not think the contention can be upheld. Barnes was not using the machine to carry out any purpose for which he was employed. We do not think that an automobile can be placed in the same category as locomotives, gun powder, dynamite and similar dangerous machines and agencies. It is true that the operation of this machine is attended with some dangers not common to the use of the ordinary vehicle, and we believe and have already held that those who operate these machines must be held to that degree of care which is commensurate with the dangers naturally incident to their use (Lampe v. Jacobson, *153 46 Wash., 536). But we do not believe that the law would charge the owner of an automobile with a liability for damages caused by the operator thereof under circumstances found here. In the case of Robinson v. McNeill, 18 Wash., 163, this court held that, where a section foreman who had charge of a hand-car, which he used to travel over the road, loaned the same to some boys, one of whom was injured thereby, the railroad company was not liable; as the foreman was not authorized to permit the hand-car to be used for such a purpose."
In the case of Lampe v. Jacobson, 46 Wash., 536, quoted in the foregoing decision, the Supreme Court of Washington, while not deciding that the automobile is a dangerous instrumentality, lays down the general principle of law relative to the care and caution required in the operation of an automobile, and I quote this for the purpose of showing how the Supreme Court of Washington in these two decisions has differentiated between the inherent dangers of an automobile and the dangers in its use and operation. The court uses the following language:
“The operation of an automobile upon the crowded streets of a city necessitates exceeding carefulness on the part of the driver. Moving quietly as it does, without the noise which accompanies the movements of a street car or other ordinary heavy vehicle, it is necessary that caution should be continuously exercised to avoid collisions with pedestrians unaware of its approach. The speed should be limited, warnings of approach given and skin and care in its management so exercised as to anticipate such collisions as the nature of the machine and the locality might suggest as liable to occur in the absence of such precautions.”
In Lewis v. Amorous, 3 Ga. App., 50, the court say:
“It is insisted in the argument that automobiles are to be classed with ferocious animals, and that the law relating to the duty of the owners of such animals is to be applied.
“It is not the ferocity of the automobile that is to be feared, but the ferocity of those who drive them. Until human agency intervenes, they are usually harmless. There are times when these machines not only lack ferocity, but assume such an idisposition to go that it taxes the limits of human ingenuity to make them move at all. They are not to be classed with bad dogs, vicious bulls, evil-disposed mules and the like.”
In Slater v. The Advance Thresher Company, 97 Minn., 305, the court say:
*154 “The rule of law applicable to the care and protection of dangerous instrumentalities does not apply. The rule requires the master to exercise a proper degree of care to guard, control and protect dangerous instrumentalities owned or operated by him, and, an injury occurring by reason of the improper use of such an instrumentality by a servant, though occasioned while not in the performance of his duty, the master is liable; but the principle on which liability is founded in such eases is the failure of the master to properly keep within his control such dangerous agencies.”
In Cunningham v. Castle, 127 N. Y. App. Div., 580, the court say:
“ It is urged that the automobile was a dangerous instrumentality, and that, having been entrusted to the chauffeur, the liability of the master still attached because of its dangerous character. The automobile is not necessarily a dangerous device. It is an ordinary vehicle of pleasure and business. It is no more dangerous per se than a team of horses and a carriage, or a gun, or a sailboat, or a motor launch. There is no evidence that the chauffeur was not competent and qualified to run the machine. If a game-keeper had borrowed his master’s gun and had gone from the estate on a hunting expedition of his own, and had negligently shot a man, would the master be responsible because he was using that instrumentality which might be dangerous if carelessly used — a gun?”
In Danforth v. Fisher, 71 Atl. Rep., 535 (N. H.), the court say:
“Plaintiff’s contention, that the owner of an automobile is liable to strangers in the same way and to the same extent he would be if it were a wild animal, has no force. There is nothing inherently dangerous about an automobile any more than about an axe. Both are likely to injure those who come in contact with them when they are used for the purpose for which they were intended, and both are harmless so long as no one attempts to use them.”
There are several cases wherein the court has discussed the subject of the gasoline used for power and purposes in the automobile, and almost uniformly, by reason of the explosive character of gasoline, the courts have classified gasoline as a dangerous agency, the same as dynamite and other explosives, but in *155 none of those cases has the court held that the automobile, itself is a dangerous instrumentality.
I do not think, therefore, that an automobile can be judicially determined to be a dangerous agency in the sense that dynamite and other high explosives have been so determined. But its tremendous development within the last ten years, its high power and capacity for'speed, and its great weight, have attracted and are attracting the attention of legislatures and courts throughout this country and in Canada.
In May, 1908, the Legislature of this state (99 O. L., 538) passed an act for the regulation, identification and registration of motor vehicles. It defines, among other things, the term •“motor vehicle,” the word “chauffeur,” the word “.owner,” and provides for what records are to be kept by the Secretary of State at Columbus, the assignment of numbers, placards front and rear, the registration fee, for brakes and. alarm devices, lights front and rear, speed, speed limits, duty when meeting horses, duty to stop in case of accident, regulations as to chauffeurs, their badges, etc., and penalties, penalty for displaying false placard, penalty for other than owner, arrest, bail, etc. And the. act specifically provides that it shall be unlawful for any person to drive or cause to be driven any motor vehicle upon any public, road or highway of the state in the absence of the owner without said owner’s written consent.
It is urged that a fair interpretation of this act is to make the automobile a dangerous agency; that the people of the state, acting through the Legislature, have in effect so defined it.
The Province of Ontario, a few years ago, passed a law very much like our own, and the divisional court, interpreting the statute in a case quite similar to the one at bar, uses this language:
“I am inclined to hold that, having regard to the provisions of the act, as to the registration of the owner, the carrying of a number on the machine for the purpose of identifieatioñ, and the permit granted on those conditions, as between the owner and the public, the chauffeur or driver is to be regarded as the alter ego of the proprietor, and that the owner is liable for the driver’s negligence in all eases where'the use of the vehicle is with the sanction or permission of the proprietor. In driving the motor *156 lie is within the ostensible scope of his employment, and the liability will remain by virtue of the statute, and this even though the driver may be out on ,an errand of his own."
It was urged there, as here, that the chauffeur was not engaged in his employer’s service, but was taking a joy-ride with some ladies, which was conceded.
The effect of this decision is, to wipe out entirely the old and well-established doctrine of master and servant so far as the automobile is concerned, and to place it in the category of dangerous agencies.
North Dakota has an act making the owner liable in damages, whoever the driver may be, while violating its provisions. So has Tennessee, making the machine liable, in part, for whatever judgment may be recovered, whether it be driven by the owner or any person in violation of the act. Likewise Kentucky and England.
A statute much like our own was passed by the state of New York in 1904, and one of her courts corresponding to our common pleas court has already determined “that the Legislature regarded automobiles as dangerous machines, and that their owners should be under special liabilities for the manner in which they are operated. No such restrictions have ever been imposed on other methods of transportation on highways. It is absurd to say that an automobile is no more dangerous than a team of horses. Fatal accidents have been of almost daily occurrence, and have come to be regarded in both city and country as a menace to people on the highway. The rapidity and stillness of their movements make them especially dangerous to pedestrians.” 118 N. Y. Sup., 400.
This opinion, however, seems to be a direct contradiction of 127 App. Div., 580, previously rendered. Says that court:
“It may be that it would be wise and in the public interest that responsibility for an accident caused by an automobile should be fixed to the owner thereof, irrespective of the person driving it, but the law does not so provide."
I do not myself feel justified in taking so radical a view as the Ontario court, or as that of the 118 N. Y. Sup. I am dis *157 posed rather to accept the more conservative judicial opinion of the Appellate Division.
To hold that our Legislature has, in effect,- determined that the automobile is a dangerous agency, is to push the judicial function into the field of legislation. If the Legislature had so intended, it seems to me it would have so stated in explicit words. If it desire so to do, that is certainly its privilege, subject to such attacks as may be made.
Incidentally, and apart from the case, I observe certain impressive facts standing out prominently from the investigation, if I am correct in this opinion. Under the statute and the decisions, the public has no civil protection whatever from the irresponsible, reckless, drunken, joy-riding chauffeur acting beyond the scope of his employment. Direct legislation on this subject would doubtless result in greater care in the selection of persons who are entrusted with these at least quasi dangerous agencies. That public sentiment, as voiced by a few of the courts and by many of our legislatures, is growing iu this direction, is apparent. The legislatures of several states have already declared certain occupations dangerous, and fixed liability resulting from injury in them. Such legislation has, as a rule, so far been sustained on .the ground that it has a reasonable relation to the public welfare. Whether the automobile can be so classed is quite another matter and has nothing to do with the questions raised here. Flowing from such legislation, however, it is easy to forsee a vast amount of litigation touching constitutional rights.
Motion granted.